## GILHAM & BROWN *vs*. WELLS *et al*.

1. The town authorities of Stone Mountain, though having power by charter to grant or withhold licenses to retail liquors, and to establish police regulations generally, cannot, after granting a license, and while retaining the fee paid for the same, pass and enforce an ordinance requiring all retailers (this grantee included) to close doors and forbear to sell whilst, and at all times when, "any denomination of Christian people" are holding divine service anywhere in the town, the ordinance being silent as to any and all other worshippers.

2. A stipulation in the bond of a retailer to abide by all ordinances which may be passed, does not bind him to a subsequent ordinance which the town authorities have no power to pass.

JACKSON, Justice, dissented.

Municipal corporations. License. Contracts. *Ultra vires*. Estoppel. Ordinance. Before Judge SPEER. De-Kalb Superior Court. March Term, 1879.

Gilham & Brown brought case against Wells and others they being the mayor and a majority of the council of the town of Stone Mountain, who had voted for the ordinance recited in the opinion, for $1,000.00 damages, alleged to have been sustained by them on account of the enforcement of such ordinance, which they claimed to be illegal, *ultra vires*, and void. Plaintiffs alleged that on the 5th of January, 1878, the mayor and council of Stone Mountain granted them license to sell and retail spirituous liquors within the corporate limits of said town for the period of the next ensuing twelve months, they paying therefor $175.00, taking the oath and giving the bond required of

them.   That on the fifteenth of the same month defendants passed the ordinance referred to, without authority of law, in excess of their chartered powers, and for the purpose, and with the malicious intent, of injuring, disturbing, and so far as they could, of depriving plaintiffs of the exercise of their said licensed privileges.   The declaration then sets out how strictly the ordinance was enforced by the defendants, and shows the damage to the plaintiffs.

The defendants pleaded the general issue, and estoppel by reason of the terms of the bond executed by plaintiffs as a condition of obtaining license.

The jury found for the defendants.   The plaintiffs moved for a new trial upon the following grounds:

1.  Because the verdict was contrary to law, evidence, and the principles of justice and equity.

2.  Because the court erred in charging the jury as follows: "The mayor and council had full power and authority under and by virtue of the charter granted to the town of Stone Mountain, to pass and enforce said ordinance recited in the declaration, and possessing such power they were not individually liable to the plaintiffs for any damage sustained by them by reason of the passage and enforcement of said ordinance."

3.  Because the court erred in charging as follows: "If you believe, from the evidence, that at the time the plaintiffs procured license to retail in 1878, they entered into bond conditioned to keep the ordinances of the present mayor and council, and their successors in office, regulating the retailing of spirituous liquors, then the plaintiffs would, by the same act, be estopped from recovering damages of the defendants."

The motion was overruled, and plaintiffs excepted.

The facts, in addition to those above stated, so far as material, will be found in the opinion.

L. J. WINN, for plaintiffs in error.

HULSEY & McAFEE, for defendants.

BLECKLEY, Justice.

It is impossible to ignore the evils of intemperance or the blessings of religion. No candid observer can fail to notice them or to be impressed by them. That the vocation of retailing spirituous liquors promotes intemperance is certain; nevertheless, a retailer is entitled to all his legal rights, and they cannot be denied to him in the interest of religion, great as it is, or in any other interest. No court can mould its decisions by a higher standard of morality than the morality of the law. Law is the measure of forensic justice. So far as I know, the court-house is the only place on earth where the vicious and the virtuous may contend upon perfectly equal terms, receive the same patient and impartial hearing, and have their respective dues, whatever they may be, meted out in the decision. It is this characteristic, more than any other, which entitles the court-house to be called a temple of justice.

1. By charter, the mayor and council of the town of Stone Mountain have power "to do and perform all things toward keeping the peace, preventing vagrancy, lewdness, violations of the sabbath, playing at cards, or at any other game or sport at which money is usually won or lost, take all means to cause the streets to be worked, nuisances to be removed, and to do all and every act they may think proper to preserve the morals, health and good order within the corporate limits of said town, as fully and as effectually as if a grant of power were hereby given them in every case which may arise, and power to grant or refuse license for peddlers, and to pass all laws, ordinances and by-laws for the government of the same, so as to enable them to do and perform all acts not inconsistent with the laws of the United States or the state of Georgia;" also, "to abate nuisances and enforce proper police laws;" also, "to impose such fines not exceeding fifty dollars, or imprisonment in the calaboose not exceeding twenty days, or both, for the violation of any of the laws or ordinances of said town within

its corporate limits;" also, " to grant or withhold, to any person or persons, license to retail and sell spirituous liquors within said limits, and in no case shall the license be for a larger sum than two hundred dollars for twelve months, and no license shall be granted for a less time, and the person receiving the same shall execute bond and security to said mayor and his successors in office, conditioned that he will not sell liquors on the sabbath-day, and shall also take an oath to observe and not violate the ordinances of said town; and for a violation of any of said ordinances, the party guilty thereof shall be liable to pay such fines as may be assessed by said mayor or any three members of council." Acts of 1872, p. 266.

Under these charter provisions, the mayor and council established by ordinance a fee of $175.00 for a license to retail spirituous liquors; and on the 5th of January, 1878, the plaintiffs in error paid the fee, gave the required bond, took the prescribed oath, and procured a license to retail for twelve months from that date. There is no dispute that they thus became entitled to retail within the town, and that they entered into business accordingly. Shortly afterwards, new incumbents were installed in the mayoralty and council, and the former board retired. The new board, of which the defendants were members, passed an ordinance in the following terms, and caused it to be enforced:

" Be it ordained that during the continuance of divine service at any time hereafter to be held by any denomination of Christian people within the corporate limits of Stone Mountain, the doors of all houses or rooms where intoxicating liquors are sold by retail shall be closed; and if any person sell or cause or permit to be sold, or in any manner furnish any intoxicating liquors, spirits, wines, or other intoxicating drinks during the time appropriated to such worship, he shall pay a fine of fifty dollars upon conviction for each offense. And it is further ordained that this prohibition shall cover the entire time appointed for such divine worship, from its commencement to its final close, that is,

it covers not only the time in which such services are being actually performed, but on all protracted occasions, it covers intermissions by day and night."

At the trial of the present case in the court below, the presiding judge charged the jury that the mayor and council had power, by virtue of the charter, to pass and enforce this ordinance. The jury were thus constrained to find against the plaintiffs on one of the main branches of the controversy.

a. The chartered power in respect to license is to grant or withhold, and the duration of the grant cannot be less than twelve months. Does the power to grant or withhold include or imply the power to grant, and after granting, to forbid the use for some indefinite or uncertain part of the twelve months, both by day and by night? Nothing is more manifest than that the validity of the ordinance cannot be made to rest on this provision of the charter.

b. The general police powers conferred by the charter are, however, very broad and comprehensive. May the ordinance stand upon them? Mark that the divine service or worship which the ordinance embraces is not confined to public service or worship in a church, meeting-house, or other defined or described place or places, but that the ordinance comprehends worship conducted anywhere in the town. By charter the area of the town is a circle having a radius of 1000 yards, and, of course, a diameter of 2000. Any denomination of Christians might assemble on any part of this area, at any time, by day or night, and when their services of devotion began the business of the plaintiffs had to be suspended and remain suspended until the services were over. The worshippers might take rests or intervals in their spiritual exercise, and during these, might return to their avocations and prosecute them, but the plaintiffs' doors were to remain closed until the final breaking up. By adjournment from day to day and from night to night, a religious meeting might be protracted indefinitely; and in a time of peculiar zeal and excitement, a few such pro-

tracted meetings by each of the Christian denominations, coming one after another, might exhaust a good part of the year. In neither place nor time does the ordinance lay down any limit. It leaves open the whole territory of the town to become the scene of protracted worship, and every day and every night, and each hour and minute of the day or night, the services may begin, continue or be resumed. And the Christians, not of the town only, the county, the state, the Union, the continent, but of the whole earth, are allowed at their pleasure to close the plaintiffs' doors and arrest their business on the sole condition of holding divine service somewhere, anywhere, in the town. The will of Christendom is thus made the arbiter of the plaintiffs' traffic, and the corporate will of the mayor and council determines nothing but the duty of submitting, and the penalty of disobedience. To compare this ordinance to one which requires retail establishments to be closed at a specified hour in the night (10 *Ga.*, 532), is like comparing an indefinite tract of forest to some certain, well-known tree in a city park. For the authorities of an incorporated town to license a business, and then by ordinance to expose it to indefinite suspension at the will of any and every assembly of Christians who may choose to engage in exercises of devotion anywhere within the corporate limits, seems to me unreasonable as a police measure, or in any other aspect.

*c.* But were it competent for the mayor and council to set up indirectly any will other than that of the corporation to regulate the time of closing and re-opening the plaintiffs' doors, and could they select for that purpose the devotional will of worshipping assemblies, it is contrary to the spirit and genius of our law to discriminate for or against any particular religion, faith or creed. There can be no monopoly of any privilege connected with worship or the protection of worship. If profane doors must close for one faith, they must for every faith. To readers of the constitution and the Code of Georgia, such a phrase as "any denomination of Christian people," is unfamiliar as a legal

expression, and the reason is, that the state treats all religions alike. I will cite some examples from the Code:

Buildings used for "public worship" exempt from taxation. §798, p. 4. "Church" may be incorporated. §1677. Conveyances to or for use of any "church or religious society" for the purpose of erecting "churches or meeting-houses," good and valid. §2343. Trustees subject to the authority of the "church or religious society" for which they hold in trust. §2344. Provisions for "religious" instruction or worship, proper matter of charity for equitable jurisdiction. §3157, p. 3. Nothing "religious" if licentious in tendency, or inconsistent with the peace and safety of the state. §3159. Every "church or religious society" authorized to fill up vacancies in its trust board. §2345. All criminal laws in force March 5th, 1856, for the protection of "religious societies," extended to all societies by whatsoever name called. §2346. Selling, or causing to be sold, any spirituous or intoxicating liquors, within one mile of any "church or meeting-house," or other place set apart or being used for "divine service," during the time appropriated to such worship (unless the same be within an incorporated city or town), declared a misdemeanor. §4575. Vending or exposing to sale anything whatever within one mile of a camp-ground, during a period of "divine worship," without written consent, made penal. §4576. Policemen may be appointed for any incorporated "church or camp-ground," whose duty it is to arrest disturbers of the congregation assembled for "religious worship." §4577. Bathing on the sabbath day in view of any route to or from any "house of religious worship," declared a misdemeanor. §4581. The religious attitude of Georgia is that of a friend to religion generally, with no faith or creed of her own, and no preference for one over another. Her laws protect all equally and impartially, and she has conferred no authority on any local board or other body of magistracy to legislate in behalf of the "denominations of Christian people" and leave all others out. There is no "state" religion, and there cannot be a "town" religion.

2. In the bond which the plaintiffs gave when they obtained their license, they undertook to "abide and keep all ordinances of the present mayor and council and their successors in office, regulating the retail of spirituous liquors, and save harmless the present retiring mayor and council from any damages or responsibility that may grow out of issuing said license." The court, in charging the jury, treated this bond as estopping the plaintiffs from any recovery in their action. The previous instructions had already killed the case, and this slew the slain. The proper construction of "all ordinances" is, all legal ordinances—all that could be legally enacted. An ordinance which is *ultra vires*, or for any other reason void, is no ordinance at all. It is no more than blank paper. If a person contracts to obey all statutes passed by the legislature, must he therefore obey an unconstitutional act? Surely not.

The charge was erroneous, and there should be a new trial.

Judgment reversed.

WARNER, Chief Justice, concurring.

The seventh section of the charter of Stone Mountain declares "that the mayor and council of Stone Mountain shall have power to grant or withhold, to any person or persons, license to retail and sell spirituous liquors within said limits (one thousand yards in every direction from the Georgia Railroad depot), and in no case shall the license be for a larger sum than $200.00 for twelve months, and no license shall be granted for a less time, and the person receiving the same shall execute bond, etc." This section of the charter is exhaustive upon the question of retailing spirituous liquors within the limits of Stone Mountain, and confers no authority on the mayor and council to pass the ordinance complained of. The sole power granted in the charter in relation to the sale of spirituous liquors within the limits of the corporation, is the power to withhold or

to grant the license on the terms therein prescribed. If the mayor and council grant the license to retail for twelve months, and receive the money therefor, then, under the charter, with the money in its treasury, it had no power or authority to practically defeat the object of granting the license by the passage of the ordinance in the record. In other words, the mayor and council, under its charter, have no power delegated to it to serve "God and Mammon." If it desires to serve the former, then let it withhold the license; if the latter, then let it grant the license, take the money for it, and let the traffic go on, but don't undertake to run both schedules, especially when its charter does not authorize any such proceeding.

Jackson, Justice, dissenting.

1. It is true that the constitution and laws of Georgia open the entire state to the free exercise of religious opinion and worship therein, so long as such worship does not embrace or encourage licentiousness or immorality; and Jew or Gentile, Christian or Pagan, are alike entitled to equal protection under our liberal and wise toleration of perfect freedom of religious thought, and equality of protection extended to religious worship. Nor do I suppose that it entered into the brain either of the counsel who advised, or the town authorities of Stone Mountain who enacted, the ordinance in question, that any preference was thereby given to Christians over other worshippers. It so happens that at Stone Mountain, as in most of Georgia villages, the only churches are Christian, and the only worshipping societies are believers in Christ as the Son of God. If there be a place of worship or any society of worshippers according to any other faith within the limits of Stone Mountain, the record does not disclose it, nor have I ever heard of such place of worship or society of worshippers therein. If such had been the case, doubtless the ordinance would have extended to them, as it should, equal protection

against the danger of riot or interruption from grog-sellers and grog-drinkers whilst the mind should be composed for the worship of the common Creator of all. Therefore, I do not think the ordinance void because it does not name other as well as Christian worshippers.

2. The charter of Stone Mountain gives to the town authorities power to grant or to withhold license to retail spirituous liquors. The power to grant, covers the terms on which license is granted, except in so far as the terms are prescribed and restricted in the legislative grant of the power. Therefore, the restriction that the retailer should not sell during religious meetings, whether stated or protracted, whether white or colored, is within the grant to license, that restriction not being forbidden by any words in the grant to license or in any other part of the charter.

A greater power includes the less over the same subject-matter; therefore the power to withhold license altogether includes the power to withhold unless it be accepted on terms, or to withhold for certain solemn occasions, or festive occasions, or on certain days. Therefore the power to put this restriction upon these retailers is clearly deducible from the very broad grant of power to withhold all license.

3. If it be argued that after this license was granted, the council could not curtail or restrict its unlimited exercise for one year, I answer that these plaintiffs, in order to obtain license, voluntarily agreed to take it subject to any *future* ordinance which might be passed by the council granting it, or by their successors. Therefore they stand precisely as if the ordinance had been passed prior to the issuance of the license. They not only so agreed, but came under bond with hands and seals thereunto affixed, to be controlled and regulated in their traffic by ordinances enacted in the future. This agreement and bond became part of the contract of license, as much so as if included in the same writing—and they are bound by their contract.

4. The plain facts, considered altogether, irrespective of any isolated views of law applicable to portions thereof,

show that there should be no recovery, and that the verdict is right.

The suit is brought to recover damages from the town authorities *as individuals*, for their conduct in the discharge of their public trusts.    It is brought under the following state of facts.    A wet and dry ticket were voted for for town authorities.    Those in favor of the retail of spirituous liquors and those against it met in battle.    There was an open field and a fair fight, and at the close of the day victory perched upon the hosts of temperance, and the dram-sellers were sorely discomfitted.

What should, what *could* they do?    They hastened to the outgoing council, before the victors who had fairly won the field could be installed, and applied for license.    Everybody loves fair play.    It looked wrong even to the outgoing party to run counter to the policy of a majority of the people, and to forestall their contemplated stoppage of the traffic.    So they finally concluded not altogether to disoblige their friends, the applicants, but to grant the license *sub modo*, on condition that they should be protected, and that the incoming administration should be permitted to do after license whatever they themselves could do before. Thereupon, on being installed a few days thereafter, the new council, naturally distrustful of those who thus procured license and anxious to do nothing without legal authority, took legal counsel and advised with Judge FLOYD in respect to their powers under this state of facts and their charter. The judge advised them that they could not revoke the license, but that they could regulate how it should be used; and at their request drew up the ordinance in question which the council adopted.    And this suit is brought by these plaintiffs, thus obtaining license against the will of the majority of the community in which they live, and thus under bond imposed by their own friends to abide the terms which should be imposed by the new council, against that council for their official conduct in passing the ordinance and enforcing it, on the ground that they acted ma-

liciously. It is sought to make these officers *individually* and *personally* liable for fines imposed and paid into the treasury of the town, and for profits on the liquors they could have sold whilst God was being worshipped, and in which the defendants had no personal or pecuniary interest whatever, notwithstanding the hot haste with which plaintiffs rushed to thwart the community, notwithstanding the contract they made and the bond they executed, and notwithstanding the prudent and considerate manner in which the defendants *officially* acted.

In my judgment there is neither law nor equity, nor good sense, nor good morals, in permitting plaintiffs to re cover one cent; and I therefore dissent from the judgment of reversal—with entire respect, let me add, for my colleagues, and with regret that my own convictions are too strong to permit me to yield to their view of the law.